IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

WYNNE W. WASSON,

     Plaintiff,

v.                                    Civil Action No. 3:05cv865

MEDIA GENERAL, INC.,
a Virginia Corporation,

     Defendant.


## MEMORANDUM OPINION

Now before the Court are cross motions for summary judgment (Docket Nos. 10 and 12) on the plaintiff's complaint (Docket No. 1), which is the progeny of this Court's prior decision and order of remand in Wasson v. Media General, 3:04cv58 (Nov. 5, 2004) ("Wasson I"). The issue central to both Wasson I and the cross motions now presented is whether, under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq. ("ERISA"), and the terms of the disability benefits agreement between Media General and Wasson, a former Media General employee, Wasson is entitled to long term disability benefits.


## STATEMENT OF FACTS

Because the facts leading up to the decision rendered in Wasson I are set forth in detail in Wasson I, only the necessary facts encompassed within that Memorandum Opinion will be repeated here.

I.    **Pre-Remand Facts**

   A.    **Wasson's Injury and Pain**

   In 1991, Wynn W. Wasson, whose maiden name was Wynn Woolley, was employed as a newspaper reporter for the *Richmond News Leader*. In January of that year, she slipped and fell on a concrete parking deck while covering a news assignment.   Wasson sought medical attention from the company doctor who directed Wasson to treat her bruising and swelling with cold baths.   Wasson continued working and, when the *Richmond News Leader* merged with the *Richmond Times Dispatch*,[1] Wasson was assigned as a police reporter.

   Over the course of the next two years, Wasson developed chronic back pain, which she attributed to a worsening of the January 1991 work-related accident.   In 1993, Wasson visited Dr. J. Kim Harris, a neurologist, who made several unsuccessful diagnostic efforts to determine the cause of Wasson's chronic back pain.   Upon Dr. Harris's referral, Wasson consulted Dr. Bruno J. Urban, a pain specialist at Duke University Medical Center, who concluded that no notably pathology was evident.   Wasson continued to see Dr. Harris for several years, trying various western and eastern medicine treatments, including physical therapy, acupuncture, and massage, but to no avail.   In 1997, Harris referred Wasson to Dr. Michael Decker, an orthopedic surgeon, who, in March 2001, performed a CT-Scan on Wasson's lumbar spine and found a "[r]ight sided radial

_____

   [1] The Richmond Times Dispatch is owned by Media General.

tear of the L5-S1 level." See Wasson I, at 3.  Based on this objective testing, Dr. Decker diagnosed Wasson with Degenerative Disk Disease.[2]

In the late 1990's, the *Richmond Times Dispatch* assigned Wasson to cover the government affairs of three counties in the Richmond area.  This assignment required significant driving and physical activity.  In 1999, recognizing Wasson's pain, the *Richmond Times Dispatch* reduced her assignment to two counties. However, the job proved too taxing for Wasson, who continued to suffer from chronic back pain, and, on August 22, 2000, Wasson ceased performing her job.  Within days thereafter, Wasson applied for and received short-term disability benefits (hereinafter "STDB") under Media General's Advantage Flexible Benefits Plan (hereinafter "the Plan").  Her STDB terminated in late February 2001.  Still feeling unable to work, Wasson applied for long term disability benefits (hereinafter "LTDB") in February 2001.  Shortly thereafter, Media General informed Wasson that her employment was terminated as of March 24, 2001.

## B. The Plan's Administration

At all times until her STDB expired, Wasson was covered under the Plan.  Media General funds the Plan for its employees, and,

---

[2] Wasson's mental health is not in issue in this case.  As a result of the persistent debilitating pain, Wasson, in the 1990's, became depressed and sought the services of a Dr. Richard Curtis, a psychiatrist, who diagnosed Wasson with major depression, and prescribed anti-depressant medication.

until late 2000, Media General administered the Plan.  Effective January 2, 2002, Media General amended the Plan, making Sedgwick Claims Management Services (hereinafter "Sedgwick") the plan administrator.  Media General notified all beneficiaries of the Plan of this change, stating in the notice that henceforth "Sedgwick CMS has the final discretion and authority to decide whether you are eligible for short or long-term disability income payments."  See <u>Wasson I</u>, at 5.  Thus, in February 2001, when Wasson applied for LTDB, Media General still administered the Plan.

### C. Social Security Disability

Sometime in 2001, Wasson applied for Social Security Disability benefits.  On May 16, 2002, the Social Security Administration awarded Wasson Social Security Disability benefits under the Social Security Administration rules.  Her benefits were retroactively effective as of August 22, 2000.  The Administrative Law Judge's decision states:

> The medical evidence confirms that the claimant has <u>severe lumbar impairments</u> resulting in chronic back pain. . . [S]he has <u>a less than sedentary residual functional capacity</u> . . . the claimant's chronic pain and depression prevent her from sustaining concentration and attention to job tasks or maintaining regular attendance at a job site.
>                         * * *
> A finding of "disabled" may therefore be reached within the framework of medical-vocational rule 201.22.

(Sedgwick-261) (emphasis added).  Thus, in May of 2002, Wasson began receiving retroactive and prospective Social Security benefits.

D.   **Wasson I**

Also in 2001, Wasson was pursuing her LTDB claim with Media General, but, by letter dated August 16, 2001, Media General denied Wasson's application for LTDB.  In February 2002, Wasson sought an appeal of that denial.

At some point during Sedgwick's consideration of Wasson's claim, Sedgwick asked Wasson to participate in a Functional Capacity Evaluation ("FCE").  Dr. V. Robert May III, Rh.D, CRP, CDE II,[3] conducted and wrote the FCE, which is dated January 8, 2003. Dr. May recorded Wasson's diagnoses as "chronic atypical facial pain with moderate remission, chronic low back pain with no remission, depression with slight improvement, fibromyalgia pain syndrome with multiple components, and excessive sleepiness often aggravated by her pain medicine." (SedgwickII-003 (emphasis added)).  Dr. May had Wasson engage in numerous activities that tested her ability to bend, reach, flex, crouch, etc. and sit, stand, and walk for extended periods of time.  Dr. May wrote that:

---

[3] These degrees and certifications are as follows: Rh.D - Doctorate in Rehabilitation; Community Rehabilitation Provider; CDE - Certified Disability Examiner.

> Ms. Wasson did not complete all test activities. She demonstrated a consistent effort in the activities she completed throughout this evaluation. . . . She managed and controlled her symptom response patterns well, such that symptoms did not influence her functioning overtly during the test.

(Id.)  Dr. May found that Wasson's "primary functional issue is that of bending to access the lower vertical planes." (Id. at 007) (emphasis added).  Dr. May concluded:

> Ms. Wasson demonstrated excellent control over her symptom response patterns and therefore demonstrated an ability to negotiate her symptoms so that a higher level of task completion could be achieved.
>      [Wasson] qualifies for the Sedentary work category within the restricted work plane . . . [and within the] competitive unrestricted vertical and horizontal work planes . . . as well.  Bear in mind that Ms. Wasson is not a candiate for the competitive labor market, but may qualify for a modified work experience, such as that found in supported employment programs.

(Id. at 009) (emphasis added).  Given these results, the Appeals Board of Sedgwick, which by then had become the plan administrator, affirmed the denial of Wasson's claim for initial LTDB.

Unsatisfied with the plan's review process and decision, Wasson filed a complaint in this Court alleging violations of ERISA and that the Plan had abused its discretion in denying her claim. Media General filed a motion for summary judgement and Wasson filed a cross motion for summary judgment.

In Wasson I, after lengthy factual analysis under the appropriate standard of review and legal standard, this Court

denied both of the motions for summary judgment and found that the appropriate course of action was to remand Wasson's LTDB application to Sedgwick for a _de novo_ assessment in perspective of the Court's decision.  On remand, the Court additionally ordered Sedgwick to afford Wasson the opportunity to submit updated evidence supporting her claim; to disclose fully all consideration given to opinions issued by medical advisors in the process of assessing the claim so that any further judicial review could be meaningfully accomplished; and, to specify and identify the definition of disability that Sedgwick used in making its decision. See _Wasson I_, at 49.

## II.  Post-Remand Facts

### A.   Definition Of Disability Under The Plan

Following remand, Sedgwick conducted a _de novo_ review of Wasson's claim.  Media General, which had relinquished management of the Plan, played no part in the review of the claim on remand.  However, the Media General plan governing the claim (_i.e._ the Plan) remained the same.  The availability of LTDB under the Plan is governed by the definitions of "disabled" and "disability" stated in the Plan. Those definitions reads:

> 2.17 [1] "Disabled" or "Disability" means
> the inability of a Participant to perform all
> (not just one or some) of the customary duties
> of his position with the Company as a result
> of bodily injury or disease, which condition
> can be expected to continue for his lifetime.

7

[2] Notwithstanding the above provisions of this Section 2.17, effective as of July 1, 2000, after a Participant receives 24 months of Long Term Disability Benefit payments, if applicable, "Disabled" or "Disability" means the inability of a Participant to perform <u>any</u> paying job for which the Participant is reasonably qualified by training, education or experience.  However, any Participant who was receiving Short Term disability or Long Term Disability Benefit payments under this Plan as of June 30, 2000 shall have his eligibility for continued Disability Benefits under the Plan determined under the definition of "Disabled" or "Disability" in effect prior to July 1, 2000.

[3] Notwithstanding the above provisions of this Section 2.17, effective as of January 1, 2001, after a Participant receives 24 months of Long Term Disability Benefit payments, if applicable, "Disabled" or "Disability" means the inability of a Participant to perform <u>any</u> paying job within the Company within a 50 mile radius of the Employee's current work site for which the Participant is reasonably qualified by training, education or experience, including, in the Company's discretion, subsequent training.

(MG-56-57) (emphasis in original).  The parties agree that the first paragraph of section 2.17 pertains to the first 24 months of LTDB available through the Plan.  If a former employee remains unable to work following the initial 24 months of LTDB, the employee may thereafter seek to qualify for permanent LTDB if he or she meets the definition stated in either paragraph two or paragraph three, depending on which time period applies.  As discussed in full below, Media General successfully argues that, the application of paragraph two versus paragraph three depends on

8

the date the claimant first applied for disability benefits of any nature.  Media General argues that because Wasson applied for Short Term benefits in late August 2000, paragraph two applies to her because that paragraph's definition became effective on June 1, 2000 and governed through December 31, 2000.

B.    **Preliminary Physician Assessment**

On remand, Sedgwick hired three medical professionals through a company called Insurance Appeals, Ltd. to review Wasson's file and determine whether, under the paragraph one definition, Wasson was eligible for 24 month LTDB.  These physicians - Dr. Robert Polsky, Dr. Joseph Jares, and Dr. Philip Marrion - opined that Wasson was not disabled from performing her job with Media General.

On January 5, 2005, Sedgwick rejected the views of those physicians and "concluded that Ms. Wasson was disabled for the first 24 months of the her long term disability period because she was unable to perform the customary duties of her position which included driving and attending meetings.  Therefore, Media General will award Ms. Wasson long term disability benefits for the period beginning 3/1/01 and ending 2/28/03." (SedgwickIII-059.)  Although the Review Board's letter does not state the reason it came to a conclusion contrary to that of the three Insurance Appeals physicians, what appears to be an internal memo stating the Review Board's decision explains that, while the physicians believed Wasson's job was sedentary, Sedgwick correctly understood that

Wasson's job required physical activity and, therefore, was not sedentary. (SedgwickIII-062.)  Sedgwick granted Wasson's claim for 24 month LTDB in 2005, and the payments for the 24 month period applied retroactively to the period of March 1, 2001 through February 28, 2003.

### D.   Sedgwick Review Board Denies Post-24 Month LTDB

To determine whether Wasson qualified for disability benefits following the 24 month LTDB, Sedgwick requested that Wasson do a Transferable Skills Assessment ("TSA"), which assesses what other types of jobs a person can do given the particular limitations or disabilities.  A company called Genex conducted the TSA by examining Wasson's education and work history, her medical condition, and the jobs available in the Richmond, Virginia metropolitan area for someone with Wasson's condition.  Genex purportedly based its conclusions on the FCE conducted by Dr. May in January 2003.  In its report of January 25, 2005, Genex found that Wasson could work in the Richmond area as a continuity writer, wire service news editor, advertisement writer, greeting card editor, interviewer, customer complaint clerk, script reader, radio dispatcher, classified ad clerk, customer service representative, and receptionist. (SedgwickIII-080-087.)

Based on the Genex TSA, on February 17, 2005, the Review Board denied Wasson's claim for post-24 month LTDB. (SedgwickIII-090.) Wasson then obtained two letters from her treating physicians, Dr.

Harris and Dr. Decker, which concluded that the TSA's conclusions were unsubstantiated, lacked foundation and expertise, and were incorrect.  With those letters, on May 6, 2005, Wasson requested the Sedgwick Appeals Board reconsider her claim for post-24 month LTDB.

### E.   Consideration By The Appeals Board

In her letter requesting appeal, Wasson states that the TSA was invalid because it was not conducted by a physician and the authors had not personally examined Wasson.  However, although the TSA was not conducted by a physician, it was conducted and written by Carol Mihm, MS, CRC, CCM, LPC, and reviewed by Christine Carroza-Roth, MS, LTD Program Manager.[4]  Although not physicians, these individuals have training in vocational and disability services and the fact that they are not physicians does not foreclose consideration of the TSA.  However, the fact that they did not personally examine Wasson diminishes the reliability of the TSA.

In a letter dated April 13, 2005, Dr. Harris, who has treated Wasson since 1993, states that Wasson has "chronic pain which has been intrusive, persistent and involving low back pain with radiation into the legs . . . and back and associated with intermittent to moderate to severe pain." (SedgwickIII-095.)  Dr.

---

[4] These degrees and certifications are as follows: MS - Masters of Science; CRC - Certified Rehabilitation Counselor; CCM - Certified Case Manager; LPC - Licensed Professional Counselor.

11

Harris states that, contrary to the conclusions reached by the TSA, pain can affect one's ability to show up for work, work productively, and affect one's cognitive abilities while at work due to the episodic and crescendoed nature of pain.   For those reasons, Dr. Harris reaffirmed his previously stated view that Wasson "remains permanently disabled to perform any paying job. This opinion is within reasonable degree of medical probability." (Id. at 096.)  Dr. Decker's letter explains Wasson's condition and states that she is presently taking Oxycodone 10 mg, five times a day, transdermal fentanyl 150 mcg per hour for pain management and Ritalin 40 mg, four times a day to help treat the drowsiness caused by the opiates.   Dr. Decker states that he agrees with the conclusions in Dr. Harris' letter and adds that the high doses of medications would be expected to cause Wasson to suffer from cognitive impairment, making it likely that no firm would hire her. (SedgwickIII-097.)  This recitation of Wasson's pain medication is objective evidence showing that Dr. Harris and Dr. Decker believed Wasson suffered from debilitating pain as well as the drowsiness induced by such medication.   There is no evidence that these doctors were prescribing this type and strength of medication without medical justification.

With her appeal, Wasson also submitted a Vocational Assessment done by H. Gray Broughton, along with Broughton's curriculum vitae. Broughton, who currently is the CEO of Broughton Associates Inc.,

12

served as the Commissioner of the Department of Rehabilitative Services for the Commonwealth of Virginia from 1999 to 2002, has a masters degree in Rehabilitation and Special Education Rehabilitation Services, is a Certified Rehabilitation Counselor and is a Senior Disability Analyst and Diplomat of the American Board of Disability. (See SedgwickIII-102 et. seq.)

Broughton reviewed the conclusions of all the experts and doctors who had reviewed Wasson's case and stated, "I know of no sedentary jobs, of any type, that Ms. Wasson could perform with these various considerations and limitations." (SedgwickIII-019.) Broughton opined that "[e]mployability is not only the ability to get out of bed, walk, stand, and sit a certain amount, but a person must have the ability to perform the essential tasks of the job . . . . It requires capability to attend, concentrate and have the pace and persistence to perform worker requirements." (Id.) Broughton concludes that due to her pain, Wasson does not have capability to concentrate and work throughout the day.

Broughton also found that the jobs recommended by Genex "are similar in nature from a skill level to the job of a reporter . . . . [A]ll of these jobs are highly skilled, sedentary and full time, 40 hours plus per week." (Id. at 109.) Broughton concluded that the TSA was defective because "Genex did not interview Ms. Wasson, or have her examined by a physician, nor has Media General submitted medical reports to support their position

that Ms. Wasson is not disabled." (SedgwickIII-111).  Based on his twenty-three years of experience in the field, Broughton concluded that, "given Ms. Wasson's current circumstances, she is currently disabled from gainful employment. . . [she] is unable, due to her current medical condition, to perform any paying job for which she is reasonably qualified by training, education, or experience." (Id.)

Sedgwick presented two medical opinions on Wasson's condition to the Appeals Board.  These opinions appear in the record in the form of emails from the physicians to Heidi Lasser, the Appeals Specialist at Sedgwick in charge of Wasson's case.  The first email is from Hubert Thomason, MD.  However, the email does not clarify what type of doctor Dr. Thomason is, except to state that he is licensed in Colorado.  The email is only a paragraph long, fails to mention what documents Dr. Thomason reviewed, but opines on Wasson's psychiatric condition, concluding that Wasson is not disabled due to her psychiatric status.  Dr. Thompson's opinion is irrelevant to the issue presented here because Wasson does not claim that her psychiatric struggles render her disabled.[5]

The other opinion is found in the record in an email correspondence between Heidi Lasser and Barry Kern, MD.  The correspondence begins on May 30, 2005 with an email from Dr. Kern

---

[5] That is clear from the record on remand, Wasson's briefs, and the statements of her counsel made on the record.

14

to Lasser requesting payment of $787.50 for the three and a half
hours Dr. Kern spent reviewing Wasson's file and writing the
opinion.  The opinion is appended to the email.  The opinion is one
paragraph and states that:

> the medical documentation does not present any
> objective evidence to support her disability.
> She has a normal neurological exam with normal
> motor strength. Her neurologist presents no
> objective data to support disability. . ..
> The statement that she can no longer work due
> to her pain is based on subjective complaints
> only. . ..  She has no significant structural
> back problems on MRI and the radial tear on
> discography is found in many asymptomatic
> individuals.

(SedgwickIII-0119.)  Lasser responded to Dr. Kern's email by
stating:

> Dr. Kern, we have an urgent need to have a
> line or two added to your report that
> indicates what objective medical information
> you reviewed, eg [sic] the FCE from 01/03,
> etc. (more than the reference to the 1995
> information) and an explicit statement that
> you used this information to base your
> opinion.

(SedgwickIII-0118.)  Dr. Kern replied with a list of the medical
documents he reviewed and asked Lasser how she would like him to
edit the opinion to include the sources.  Eventually, the opinion
is edited with the only addition being the introductory clause of
the sentence that now states, "[b]ased on review of all medical
documentation going back to 1995 and going up through April, 2005,
including her FCE, she has a normal neurological exam . . .." (Id.
at SedgwickIII-115.)  With these changes, Lasser responds "[t]hank

15

you extremely much." (Id.)   Dr. Kern did not consider the most recent views of Dr. Harris or Dr. Decker which post-date Dr. Kern's opinion.

### F.   The Appeals Board's Denial Of The Claim

The Appeals Board denied Wasson's claim by letter dated June 30, 2005.   The Appeals Board states that it conducted its review giving no deference to the Review Board's prior decision, and reviewing de novo all materials in Wasson's file, including the opinions of Dr. Kern, Dr. Thomason, Dr. Harris, Dr. Decker, and Broughton, which were all filed after the Review Board's determinations.   The opinion then restates almost verbatim the opinions stated in Dr. Thomason and Dr. Kern's emails discussed above. (SedgwickIII-0121.) In particular, the Appeals Board states that "medical documentation going back to 1995 and up through April 2005, including her FCE . . . does not present any objective evidence to support her disability . . .." (SedgwickIII-121.)   The letter concludes that "[a]fter considering the opinions of the independent physician advisors and the additional materials submitted by Ms. Wasson, the Appeals Board determined there was insufficient evidence to support a finding that Ms. Wasson is unable to perform any paying job for which she is reasonably qualified by training, education, and degree. As such, the Appeals Board finds that Ms. Wasson no longer meets the Plan's definition of disability." (Id.)   On December 22, 2005, Wasson filed a

Complaint in this Court alleging that in denying Wasson's claim, Media General, by and through Sedgwick, abused its discretion, acted in an arbitrary, perfunctory, unreasoned, manner, and in bad faith and violation of certain provisions of ERISA contained at 29 U.S.C. §§ 1132(a)(1)(B),(e), and (f).

## DISCUSSION

### I. Standard of Review

#### A.    Cross Motions For Summary Judgment

Summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).  In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from the facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236 (4th Cir. 1995).  The court is not to make credibility determinations, as that task is for the fact finder.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The nonmoving party is entitled to have its version of all that is disputed accepted, all conflicts resolved in its favor, and to have the benefit of all favorable legal theories invoked by the evidence.  M&M Medical Supplies and Service, Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1992).  The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment

without sufficient evidence to sustain his or her burden of proof on that point. Celotex, 477 U.S. at 327.

On summary judgment, the Court must first review the evidence submitted by the parties and determine whether a dispute of sufficient magnitude exists over material facts - i.e. a dispute that it is genuine - to warrant trial. A fact is material when proof of its existence or nonexistence would affect the outcome of the case. Anderson, 477 U.S. at 248. The moving party has the burden to make the prima facie showing that there are no genuine issues. Id. at 256. This requirement exists regardless of whether the parties have stipulated that the matter is ready for summary judgment. 11 Moore's Federal Practice § 56.10[6] at n. 107. The Supreme Court has stated of the "genuine issue" inquiry that "[the] inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. "The plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires trial." Id. at 257.

In assessing this threshold question, however, the Supreme Court is clear that "the judge must view the evidence presented through the prism of the substantive evidentiary burden." Anderson, 477 U.S. at 254. That is, "a ruling on a motion for summary judgment . . . necessarily implicates the substantive

evidentiary standard of proof that would apply at the trial on the merits." Id. at 252.

Where both parties have moved for summary judgment, a court should consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th. Cir. 2003). A court reviews each party's motion under the normal standard for summary judgment. When considering each motion, "the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). The motion must be denied if there is a genuine dispute of material fact.

### B.   ERISA: Standard Of Review For Disability Claims

When a district court reviews the denial of disability benefits under ERISA, it must "initially decide whether a benefit plan's language grants the administrator or fiduciary the discretion to determine the claimant's eligibility for benefits, and, if so, whether the administrator acted within the scope of that discretion." Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 268 (4th Cir. 2002). To determine whether the plan grants such discretion, the court engages in de novo review. Booth v. Wal-Mart Stores, 201 F.3d 335, 341 (4th Cir. 2000). In cases where the employee benefit plan gives the plan fiduciary or administrator discretion, "a reviewing court may reverse the denial

of benefits only upon a finding of abuse of discretion." <u>Elliot v.</u>
<u>Sara Lee Corp</u>., 190 F.3d 601, 605 (4th Cir. 1999).

The Media General Plan here grants the administrator
discretion to make beneficiary determinations.  Article XVIII of
the Plan grants the Plan Administrator "complete and exclusive
discretion and authority to administer the plan." (MG-135.)  By
this provision, the Administrator and the beneficiary have agreed
that the administrator has discretion to determine whether a
beneficiary qualifies for Plan benefits.  Therefore, an abuse of
discretion standard of review applies to Wasson's claim.  <u>See</u>
<u>Elliot</u>, 190 F.3d at 605.

When reviewing the discretionary decision of a plan
administrator denying employee benefits, "judicial review . . . is
limited to the body of evidence before the administrator at the
time it rejected [the] claim. <u>Donnell v. Metropolitan Life Ins.</u>
<u>Co.</u>, 165 Fed. Appx. 288, 294 (4th Cir. 2006) (citing <u>Elliot</u>, 190
F.3d at 608-09).

Under the abuse of discretion standard, "the administrator's
decision will not be disturbed if it 'is the result of a
deliberate, principled reasoning process and if it is supported by
substantial evidence.'" <u>Elliot</u>, 190 F.3d at 605 (quoting <u>Brogan v.</u>
<u>Holland</u>, 105 F.3d 158, 161 (4th Cir. 1997)).  "Substantial evidence
. . . is evidence which a reasoning mind would accept as sufficient
to support a particular conclusion . . . [and] consists of more
than a mere scintilla of evidence but may be somewhat less than a

preponderance." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984).

To determine whether the administrator's decision was reasonable and based on substantial evidence, the Fourth Circuit has formulated a non-exhaustive list of eight factor that a court may consider.   Booth v. Wal-Mart Stores, Inc. Assoc. Health & Wealfare Plan, 201 F.3d 355 (4th Cir. 2000).   Those factors are:

>    (1)   The language of the plan;
>    (2)   The purpose and goals of the plan;
>    (3)   The adequacy of the materials considered to make the decision and the degree to which they support it;
>    (4)   Whether the decision-making process was reasoned and principled;
>    (5)   Whether the decision comports with other provisions in the plan and with earlier interpretations of the plan;
>    (6)   Whether the decision was consistent with the procedural and substantive require-ments of ERISA;
>    (7)   Any external standard relevant to the exercise of discretion; and
>    (8)   The Administrator's motives or any conflicts of interest it may have. Booth, 201 F.3d at 342.[6]

---

[6] In Booth, the Fourth Circuit stated the factors in a slightly different order.  The Court has reordered the factors here for convenience and the order is not inconsistent with the manner by which the Fourth Circuit has recently assessed other ERISA cases.  Specifically, the Fourth Circuit has recently framed the standard alternatively in terms of a reasonableness test, stated as whether the decision was based on a "deliberate, principled reasoning process" and was "supported by substantial evidence," or using the eight Booth factors.  The Fourth Circuit now construes the Booth factors to be "a more particularized statements of the elements that constitute the more expansive reasonableness articulation of the standard.  See Donnell v. Metropolitan Life Ins. Co., 165 Fed. Appxx. 288, 294 n.6 (4th Cir. 2006).

As the Fourth Circuit has stated, "it is not an abuse of discretion for a plan fiduciary to deny . . . benefits where conflicting medical reports are presented." Elliot, 190 F.3d at 606.

Moreover, unlike disability determinations made by the Social Security Administration, there is no so-called "treating physician" rule for ERISA claims. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). That is, while plan fiduciaries may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians," "courts have no warrant to require administrators to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. Because the rules applicable to social security claims are different than those applicable to ERISA claims, while the decision of the Social Security Administration may be considered by a plan and the Court, there is "no obligation to weigh the agency's disability determination more favorably than other evidence." Elliott, 190 F.3d at 607. "Under the deferential [abuse of discretion] standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if [the reviewing] court would have come to a different conclusion independently." With these principles in mind, the Court turns to the cross motions. Ellis, 126 F.3d at 232.

## II.   Whether There Are Genuine Issues Of Material Fact

"The parties have stipulated that the Administrative Record is complete, accurate and provides a basis for resolving this case at summary judgment." (Def.'s Mem. of Law In Support of Its Mot. for Summ. Judgment at 15.) (Hereinafter "Def.'s Mem. at #.")   As with the cross motions for summary judgment addressed in <u>Wasson I</u>, for the pending motions for summary judgment, "although each party takes issue with the other's interpretation of, and conclusions based on, the facts of record, there is no genuine dispute as to the material facts.   For that reason, the issue whether Media General abused its discretion is, at least conceptually, an issue of law." <u>Wasson I</u>, at 24.

## III. Media General's Motion

Media General argues that, while reasonable minds could disagree on whether Wasson is permanently disabled, summary judgment is appropriate in this matter because the Appeals Board's decision to deny Wasson LTDB was not an abuse of its discretion as it was the result of a "deliberate, principled reasoning process" that was "supported by substantial evidence." <u>See</u> <u>Elliot</u>, 190 F.3d at 605.   To assess this argument, the Court will apply the eight <u>Booth</u> factors, while keeping in mind that the overarching test is whether the Appeals Boards' decision resulted from a "deliberate,

23

principled reasoning process" and was "supported by substantial evidence."

## 1.   The Language Of The Plan

The Plan's language, as stated in paragraph 2.17, has three different definitions of "disabled" or "disability."   For the purposes of determining initial LTDB - _i.e._ benefits for the first 24 months after the termination of the short term disability benefits period - "disabled" or "disability" is defined as "the inability . . . to perform all (not just one or some) of the customary duties of [the employee's] position with the Company as a result of bodily injury or disease, which condition can be expected to continue for [her] lifetime." (MG-56.)   As stated above, following remand, Sedgwick found that Wasson was disabled under this definition and granted her initial LTDB.

For permanent LTDB, the plan assess Wasson's claim under the definition that reads, "'disabled' or 'disability' means the inability of a Participant to perform _any_ paying job for which the Participant is reasonably qualified by training, education or experience." (_Id._)  This definition became effective as of July 1, 2000 and the parties agree that this definition governs Wasson's case.

However, on January 1, 2001, a different definition became effective.   Under that definition, "'disabled' or 'disability' means the inability of a Participant to perform _any_ paying job

within the Company within a 50 mile radius of the Employee's current work site for which the Participant is reasonably qualified by training, education or experience . . .." (Id.)  Wasson ceased working on August 22, 2000, began receiving short term disability benefits shortly thereafter, but did not file for initial LTDB until February 2001.  During consideration of these cross motions, the Court asked the parties to explain why the definition of disability effective July 1, 2000 applies instead of the definition effective January 1, 2001 since Wasson did not apply for LTDB until February 2001.  Wasson takes the view that, because of the substance of the Appeals Board's denial, it does not matter which definition applies.

Media General argues that, because the Plan grants discretion to the administrator, the administrator may determine what date is the key date for fixing which clause of the policy applies.  On that point, Media General is correct.  However, that discretion can not be abused in making the determination.  Media General argues that the date selected here was August 22, 2000, the date Wasson declared herself to be disabled under the Plan.  To support their argument, Media General cites Music v. Western Conf. of Teamsters Pension Trust Fund, 712 F.2d 413 (9th Cir. 1983).  In Music, the Ninth Circuit assessed a claim that had a five month waiting period and held:

> it is the occurrence of the disabling injury
> which ultimately and fundamentally establishes

> the participant's right to the disability
> benefits which are ultimately paid. Prima
> facie, it seems unreasonable to fix inception
> of a participant's right to benefits on any
> date other than the one on which the final
> event ultimately providing the grounds for a
> successful claim for benefits has occurred.

Id. at 419 (emphasis added).  In Music, the event, which was a
heart attack, leading to disability was the same day as the
beginning of the plaintiff's period of disability.  In contrast,
Wasson's injury occurred in January of 1991, nearly nine years
before the July 1, 2000 effective date that Sedgwick used to assess
her claim.  Under a strict application of Music, the proper plan
would be that which was in effect in January 1991.  However, no
party suggests that plan is the appropriate plan.  Indeed, that
plan is not even in the record.

Instead, Media General essentially argues that the "final
event ultimately providing the grounds for a successful claim" was
Wasson's declaration on August 22, 2000 that she was disabled.
Media General argues that Wasson's application for LTDB in February
2001 is not the dispositive event because Wasson had already put
herself in the benefits claim "pipeline" shortly after August 22,
2001, when she filed for short term disability payments.  Media
General states that this analysis is proper because, at the time a
claimant files a claim, the claimant has a right to know all the
terms of the policy that will be applied for both short and long
term benefits.  If the policy were amended between the time a

26

claimant files for short term disability and the time the claimant files for long term disability, it would be unfair to the claimant, says Media General, for the new terms to govern the claim rather than the terms in effect when the claimant first applied for disability.  Media General adds that this is the manner by which Sedgwick universally applies the Media General policy.  While this pipeline interpretation is not the only logical way to determine what policy applies to a claimant, it is certainly a principled interpretation that can be applied even-handedly to all claimants. Accordingly, the Court finds that Sedgwick did not abuse its discretion in applying the definition of disabled in effect on August 22, 2000 in Wasson's case.

In its letter denying Wasson's claim, the Sedgwick Appeals Board actually misquoted the definition of disabled.  The letter states that the appropriate definition is "the inability of Participant <u>due to injury or disease</u> to perform any paying job for which the Participant is reasonably qualified by training, education, or experience." (SedgwickIII-0120) (emphasis added). Although "due to injury or disease" is not part of the applicable definition, the Appeals Board's error is of no moment because in analyzing Wasson's claim, the Appeals Board's letter makes clear that it used the proper definition.  (<u>Id.</u>)  Accordingly, the

27

Appeals Board applied the proper language of the Plan and this factor weighs for Media General.[7]

## 2.    The Purpose And Goals Of The Plan

The purpose of the Plan is "to provide Benefits for those Eligible Employees who shall qualify for participation." (MG-54.) Media General argues that implicit in the purpose of the Plan is the fiduciary duty to ensure benefits are granted only to those truly eligible.  The Administrator must administer the Plan in such a way as to protect the interests of all participants not just one participant.  Media General argues that because "the Plan has finite funds with which to provide benefits, it would be inconsistent with the purpose and goals of the Plan to grant Ms. Wasson permanent LTD when Sedgwick determined that there was insufficient evidence to support a conclusion that she was totally disabled." (Def. Mem. at 19).  Plaintiff does not respond to this argument.  The Court finds that the argument has merit. Accordingly, this factor weighs for Media General.

## 3.    The Adequacy Of The Materials Considered To Make The Decision And The Degree To Which They Support It

The third factor assesses whether the administrator's decision was supported by substantial evidence.  <u>Booth</u>, 201 F.3d at 344. Media General argues that the Appeals Board's decision was based on

---

[7] This error is disquieting considering that the record in <u>Wasson I</u> shows that Sedgewick was confused under the definition of disability to be used.  That was one reason for the remand.

substantial evidence because the "ultimate determination to deny Ms. Wasson's claim to permanent LTD was based on the voluminous record presented in the Prior Action, including Dr. May's FCE; the post-remand opinions and reports of no less than five (5) independent physician advisors specializing in a broad range of disciplines; the TSA prepared by two occupational disability specialists at Genex; additional information from the Plaintiff's doctors; and a Vocational Assessment."  (Def.'s Mem. at 20.)

Contrary to Media General's assertion, the Appeals Board did not list or rely on the opinions of Dr. Jares, Dr. Marion, or Dr. Polsky (the three Insurance Appeals, Ltd. doctors whose conclusions were rejected by the Review Board).  Considering that the Review Board, in granting Wasson's claim for initial LTDB, decided to reject these experts' opinions, the Appeals Board may have decided the defects in those opinions made them of lesser value in assessing Wasson's claim on appeal.  No matter what the reason, the Appeals Board did not consider the three physicians opinions and, consequently, those opinions will not be considered in assessing this factor.

The Appeals Board explicitly relied upon the opinions of Dr. Thomason and Dr. Kern.  These experts' opinions, however, raise signficant concerns.  When Wasson originally filed for initial LTDB in 2001, she listed her psychiatric troubles as part of the basis for her disability.  However, in this case, Wasson is not seeking

29

permanent LTDB on the basis of her psychological condition.  She states her claim arises from her chronic and disabling back and facial pain.   Thus,  Dr.  Thomason's  opinion  that  Wasson's psychological condition does not make her disabled is irrelevant to the question of whether Wasson is disabled due to her pain.

Dr.  Kern's  opinion  is  also  problematic.   From  the  email conversation between Heidi Lasser and Dr. Kern, it is clear that Dr. Kern's opinion was greatly influenced by Sedgwick.  Indeed, Dr. Kern complied after Lasser wrote Dr. Kern of "the great need" for Dr. Kern to insert additional language into his opinion.  Although the language inserted did not change the substance of Dr. Kern's conclusion, this email conversation demonstrates that the draft of Dr.  Kern's  opinion  that  went  to  the  Appeals  Board  was  not formulated wholly independently.  In addition, Dr. Kern states that "the medical documentation does not present any objective evidence to  support  her  disability."   (SedgwickIII-115).   However,  as discussed  below  and  in  Wasson I,  the  record  "is  replete  with objective evidence" supporting Wasson's claim that she is disabled. Wasson I, at 34.   It is serious error for Dr. Kern to have proceeded on a contrary view.

The  record  contains  Wasson's  discography  showing  a  radial tear,  which  is  clearly  objective  evidence,  and  includes  the "professional medical opinions of doctors who examined Wasson, who administered tests to her, and who professionally evaluated her

subjective symptoms and complaints." _Id._ at 33.  As the Court stated before, "[w]hile the professional opinions of doctors, based on physical examination of a patient and the related observations [about Wasson's physical condition] are not the same kind of objective evidence as a CT Scan or an MRI, they certainly are objective evidence in the form of medical opinion based on first hand observation." _Id._ For example, Dr. Decker stated that "[h]er discography shows a painful degenerative disk at the junction of the lumbar spine with the sacrum, that is the L5-S1 disk space. She responded very temporarily to an injection to that disc." (SedgwickIII-097.)

Dr. Kern acknowledged that Wasson has a radial tear on discography, but seemingly wrote the radial tear off as not objective evidence supporting her disability because radial tears are "found in many asymptomatic individuals." (SedgwickIII-115.) While it may be true that many people with radial tears in the L5-S1 disk are asymptomatic, that fact does not render the discographic evidence non-objective.  The results of a discograph, like an X-ray or CT Scan, are patently objectively under any definition of objective.

Moreover, as explained in _Wasson I_, both Dr. Harris and Dr. Decker examined Wasson and personally observed her reactions while performing various exercises.  Those exercises, and Wasson's physical reaction to them, provided objective evidence of pain.

31

The mere fact that there is no other way to measure pain than by reacting when it occurs (other than a subjective articulation of the pain) does not render the test results and medical observations about them non-objective evidence.

Further, all of Wasson's treating physicians as well as Dr. Kern acknowledge that Wasson has been prescribed significant doses of pain management drugs.  While over-medication and fraudulent medication may be a serious and real problem today, there is absolutely no evidence in this matter that Wasson's prescriptions result from fraud or over-zealous prescribing physicians.  Absent any such evidence, this Court and the Appeals Board must accept that Wasson's physicians prescribed these drugs because they reasonably believed that Wasson suffers from debilitating pain.  Those medical decisions and the prescriptions are objective evidence of Wasson's painful condition.

Given the presence of these various types of objective evidence, it is unclear what Dr. Kern believes the definition of objective evidence is.  However, whatever his definition, it was both incorrect as a matter of fact and as a matter of law.  That is, the law of this case is that the record contains objective evidence, including, inter alia, the CT Scan, the X-Ray images, the diagnosis of the radial tear, objective medical conclusions of several trained physicians, examination notes based on the objective observations of several medical professionals, and the

prescriptions of high doses of pain management medications, and the prescription of other medication to attempt to mitigate the narcotic effects of the pain management drugs.  Both Dr. Kern and the Appeals Board were in error in proceeding on the predicate that there is no objective evidence of Wasson's pain.  For that reason alone, neither Dr. Kern's opinion nor the Appeals Board's decision can stand.

Because the Appeals Board's decision provides so little in the way of analysis of the record, it is very difficult to determine upon what substantive evidence in addition to Dr. Kern and Dr. Thomason it relied.  The Appeals Board seems to have relied on Dr. May's FCE and on the TSA.   The other documents that the Appeals Board explicitly lists as evidence it reviewed support, rather than refute, Wasson's claim that she is disabled.  These sources include the Social Security Administration's decision finding that Wasson "cannot make an adjustment to any work that exists in significant numbers in the national economy; a finding of disabled is therefore reached," (Sedgwick-262.), the medical observations of Dr. Decker, Dr. Harris, Dr. Daniel, and Dr. Urban, and the discography, X-Ray and CT Scan from HealthSouth showing Wasson's radial tear.

Against the evidence cited as support by the Appeals Board, Wasson presented the pre-remand record, which included the office notes of her treating physicians Dr. Decker and Dr. Harris, the assessment by Dr. Daniel, the CT Scan and discography, and the

decision of the Social Security Administration.  In addition, she submitted the letters from April 2005 from Dr. Decker and Dr. Harris, both of whom concluded that she was disabled within the meaning of the Plan.

Wasson also submitted the Vocational Assessment by H. Gray Broughton.  As stated above, Broughton reviewed the entire record and stated that the TSA was not conclusive because the jobs it listed "are highly skilled, sedentary and full-time, 40 hours plus per week," are similar in nature to the job of a reporter, and that Wasson "cannot perform any of these jobs because of the reasons previously listed by her physicians." (SedgwickIII-110.) Broughton concluded that Wasson was "unable to perform any paying job for which she is reasonably qualified by training, education, or experience."  (Id.)  In sum, Wasson has clearly put forth persuasive and substantial evidence that she is disabled within the meaning of the Plan.

However, that does not mean the Appeals Board's decision also was not based on substantial evidence.  Indeed, the question on this motion is whether, taken as a whole, the record supplies substantial evidence to support the Appeals Board's decision.  For the reasons stated above, without Dr. Kern's opinions (which is erroneous in fact and law), the only other evidence that could support the Appeals Board's decision is the FCE and the TSA.  And, because the TSA is based solely upon the conclusions of the FCE,

34

the only evidence that could support the Appeals Board's decision is the FCE.

As stated above, "[s]ubstantial evidence . . . is evidence which a reasoning mind would accept as sufficient to support a particular conclusion . . . [and] consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984). In considering the sufficiency of the evidence, the Court may not weigh the evidence nor make any credibility determinations. Anderson, 477 U.S. at 255 ("credibility determinations, [and] the weighing of the evidence . . . are jury functions, not those of a judge") Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991) ("it is not our job to weigh the evidence"). However, Wasson's evidence "is to be believed and all reasonable inferences are to be drawn in [her] favor." Anderson, 477 U.S. at 255. Wasson must show that the Appeals Board's decision was not supported by substantial evidence, not that Wasson presented substantial evidence in her favor. Id. at 254 ("judge must view the evidence presented through the prism of the substantive evidentiary burden").

Considering all the evidence submitted by Wasson demonstrating that she is disabled from working any job for which she is reasonably qualified, and the utter failure of the Appeals Board to substantively discuss any record evidence other than the opinions

of Dr. Kern (and Dr. Thomason whose opinion is irrelevant), and considering that Dr. Kern's opinion is in error in fact and law, the Court cannot find that the Appeals Board's decision is supported by substantial evidence.  This factor then weighs against Media General.

### 4.    Whether The Decision Was Principled And Reasoned?

This <u>Booth</u> factor assesses whether the administrator's decision resulted from a "deliberative, principled reasoning process."  Following the remand in <u>Wasson I</u>, Sedgwick had Wasson's claim assessed by three physician advisors who concluded Wasson was not disabled from performing her job with Media General. Sedgwick's Review Board rejected those views and granted Wasson initial LTDB.  The Review Board found that it lacked sufficient evidence upon which to judge Wasson's eligibility for permanent LTDB.  Therefore, it notified Wasson that it was granting initial LTDB and asked Wasson to participate in the TSA.

On the basis of the TSA, the Review Board found that Wasson did not qualify for permanent LTDB.  Sedgwick notified Wasson of the denial of her claim and informed her of her right to appeal that decision, including the opportunity to submit additional evidence.  Sedgwick's Appeals Board requested Dr. Kern to review Wasson's claim and received Wasson's subsequent additional evidence (the letters of Dr. Decker and Dr. Harris and the Vocational Assessment  conducted by Broughton).

Media General argues that the procedures generally used by the Sedgwick Review Board "comport with those [the Fourth Circuit has] previously found to be deliberate and principled." Donnell, 165 Fed. Appx. 294-95 (holding that consideration of the complete record, reliance on independent medical evaluations, and assessment of the claimant's vocational capacity constituted a principled reasoned process); see also Booth, 201 F.3d at 344-45 (decision was principled and reasoned where based on "numerous reviews by independent doctors" and all evidence submitted by the claimant).

However, the determination being considered by this Court is the de novo review and opinion of the Appeals Board, not the review and decisions of the Review Board. Given the de novo nature of the Plan's review scheme, it would make no sense to assess the Appeals Board's final determination based on the preliminary procedures and decision of the Review Board. For that reason, the Court must assess specifically whether the Appeals Board's decision was the result of a deliberate, principled reasoning process.

The Appeals Board's letter denying Wasson's claim provides very little analysis of the record evidence, making it difficult to determine what reasoning or principles the Appeals Board actually applied. Compliant with the Plan's Claims Procedures and ERISA, the Appeals Board states that it "gave no deference to the previous denial of post-24 months Long Term Disability benefits."

(SedgwickIII-120.)  Thus, in theory, the Appeals Board conducted a
de novo review.

Wasson argues that the Appeals Board's decision relies
largely, if not solely, on the opinions of Dr. Kern and Dr.
Thomason.  Wasson contends that, because the Appeals Board did not
demonstrate that it fully reviewed the evidence in the record, it
did not engage in a principled, deliberate reasoning process.  As
discussed above, the Appeals Board's denial letter lists the
evidence Wasson submitted to the Appeals Board that had not been
submitted previously to the Sedgwick Review Board as well as other
evidence it considered, including, but not limited to, an Employee
Position description received from Media General, the Genex TSA,
the Functional Capacity Report conducted by Dr. May, office notes
on Wasson from Dr. Decker and Dr. Harris, X-ray and discography
results, CT Scan results from HealthSouth Occupational Health
Center, notes from Wasson's treatment at Duke University Medical
Center, St. Mary Hospital, Tucker Psychiatric Clinic, and Dr.
Daniel, and the Social Security Administration's notice of decision
in favor of Wasson. (SedgwickIII-121.)

In listing the TSA and FCE, the letter notes that the FCE
concluded that Wasson had "a wealth of experience in writing and
would have a sedentary work capacity."  (SedgwickIII-121.) The
letter states that the TSA concluded that there were several
vocational options that did not require Wasson to bend or flex in

38

a manner that would be particularly painful for her, and which took into consideration that Wasson would need to change positions, take breaks, and have accommodations for comfort.  Yet, despite listing the evidence it reviewed, the Appeals Board's letter never explicitly discusses any item on the list as a reason for denying Wasson's claim.  Nor does the Appeals Board appear to have given any consideration to the great volume of the record evidence that supports Wasson's claim of disability.

Instead, in two paragraphs, the Appeals Board's letter restates almost verbatim the opinions of Dr. Thomason and Dr. Kern. As discussed above, this is the only substantive discussion of Wasson's condition contained in the letter.  After restating Dr. Kern's and Dr. Thomason's opinions, the Appeals Board writes "[a]fter considering the opinions of the independent physician advisors and the additional materials submitted by Wasson, the Appeals Board determined there was insufficient evidence to support" Wasson's claim.  (Id.)

Through ERISA, benefit plans are accorded the discretion to make their own benefits determinations.  Elliot, 190 F.3d at 605. However, ERISA requires that plans set "forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  29 U.S.C. § 1133(1). It is insufficient for a denial letter to state that the plan has reviewed the record and come to a conclusion without stating the "specific reason" for that

conclusion.  <u>See Weaver v. Phoenix Home Life Mut. Ins. Co.</u>, 990
F.2d 154, 158-59 (4th Cir. 1990).  And, neither claimants nor the
courts bear the statutory responsibility to divine from the record
the possible valid substantive reason for a plan's denial decision.
Here, the Plan listed the record evidence it claims to have
reviewed, regurgitated one irrelevant opinion and one factually and
legally incorrect expert opinion, and stated the Appeals Board's
conclusion.   In the absence of any valid statement of the specific
reason for denying Wasson's claim, the Appeal's Board's denial can
be called neither reasoned nor principled nor can the procedure as
to which that denial is the culmination.

It is quite possible that the Appeals Board engaged in a
lengthy and careful consideration of the entire record.  However,
there is no evidence in the record that the Appeals Board engaged
in that type of deliberation.  Rather, the Appeals Board's denial
letter is the only evidence of the Appeals Board's process.  While
a district court may not "impose upon plan administrators a
discrete burden of explanation when [administrators] credit
reliable evidence that conflicts with a treating physician's
evaluation," <u>Nord</u>, 538 U.S. at 834, ERISA requires a plan to set
"forth the specific reasons for such denial, written in a manner
calculated to be understood by the participant."   29 U.S.C. §
1133(1).  While ERISA does not require much in the way of analysis
and explanation, the listing of evidence contained in the record

and the mere verbatim regurgitation of the opinions of the Appeals Board's hired experts cannot be said to demonstrate that the Appeals Board engaged in a principled and reasoned decision making process. And, this is especially true given that the Appeals Board claims to have engaged in a de novo review process.

Wasson also argues that Media General's motion should be denied because Wasson claims that the Appeals Board ignored the subjective evidence of Wasson's disability and based its decision solely on the lack of objective evidence supporting Wasson's claim. Wasson relies on language in Wasson I and her analysis of relevant Fourth Circuit case law to argue that, by ignoring Wasson's subjective evidence, the Appeals Board did not engage in a deliberate, principled reasoning process.

In Wasson I, this Court stated that:

> there is nothing in the record (or cited by Media General or Sedgwick) that requires a finding of disability to be supported by objective findings. And, given its plain text, Sedgwick's decision appears to have extended no credit to the many subjective indicia of disability that appears in the record. That is especially troublesome considering that pain is, in significant part, a subjective matter, and where, as here, the record contains no evidence that Wasson was feigning pain. To the contrary, the record is replete with evidence that supports the presence of chronic pain and the debilitating effect that it undisputedly had on Wasson.
> For the foregoing reasons, it cannot be said that Sedgwick's decision is supported by the materials that it purportedly considered.

Wasson I at 33.

41

Media General argues that the Appeals Board engaged in a principled reasoning process and did not abuse its discretion in denying Wasson's claim because the administrator has discretion to require objective evidence to support a participant's claim, and because the Appeals Board did not fail to consider Wasson's subjective evidence nor her objective evidence (including the MRI and discography).  Rather, Media General argues that the Appeals Board considered the entire record and concluded that, in the face of the TSA, the FCE, and Sedgwick's independent physician advisors, there was insufficient evidence to support Wasson's claim.

The linchpin of Media General's position is the contention that, because the Plan vests Sedgwick with discretionary power, Sedgwick may set its own standard, including requiring objective evidence of disability; and that its decisions are only to be overturned if they are made absent "a deliberate, principled reasoning process" that lacks "substantial evidence."  In support of its argument, Media General argues that "the Fourth Circuit has expressly held that failure to submit 'objectively satisfactory proof' of disability is sufficient grounds to uphold an Administrator's decision to deny benefits," (Def.'s Mem. at 21 (quoting Gallagher, 305 F.3d at 276)).  Media General cites Gallagher, Lown v. Continental Casualty Co., 238 F.3d 543, 546 (4th Cir. 2001), and Hensley v. International Business Machines, 123 Fed. Appx. 534, 538-39 (4th Cir. 2004) as support for its

42

contention.    Accordingly, the Court must assess the meaning and applicability of these cases.

In Gallagher, the Fourth Circuit first interpreted the language of the plan and applied the de novo standard of review because the plan did not grant the administrator discretion.  305 F.3d at 269-71.  The Fourth Circuit read the plan to mean that "to qualify for disability benefits, Gallagher must submit objectively satisfactory proof that he was unable to perform all the material duties of his regular occupation . . .."   Id. at 270.   In Gallagher, the Fourth Circuit did not mean objective evidence in the sense of an MRI, X-ray, or some other tangible or physical demonstration of disability.  By objective, the Fourth Circuit clearly meant evidence that, based on an objective analysis by the administrator - and the court on review - was satisfactory to prove Gallagher was disabled within the meaning of his plan.  See Id. at 269 (contrasting the subjective standard applied in abuse of discretion cases against the objective standard applied in de novo cases).  Gallagher cannot be read to hold that a failure to submit objective evidence - where objective is used to mean tangible or physical - is a sufficient grounds to uphold an administrator's decision.

In Lown, in reviewing a non-discretionary plan under the de novo standard, the Fourth Circuit found that, notwithstanding requests by the plan for medical tests showing disability, "no

objective medical test confirmed Lown's disability."  238 F.3d at
549.   In addition, the evidence submitted by Lown's own doctors
refuted Lown's claim.   Under the plan, Lown had to prove she was
totally disabled prior to December 16, 1997.   However, one of
Lown's doctors stated she was totally disabled as of August 1997
while the other stated she was disabled as of February 1998.
Moreover, Lown continued working more than a month after the August
date of alleged total disability.   <u>Id.</u>  On these facts, the Fourth
Circuit upheld the district court's determination that the plan
properly denied Lown's claim.   <u>Id.</u>  Accordingly, the defendant is
incorrect in stating that <u>Lown</u> stands for the proposition that a
lack of objective medical evidence is alone sufficient grounds to
deny disability benefits.   The additional facts of <u>Lown</u> were
equally important in the Fourth Circuit's decision.

Lown's case differs from Wasson's case in that the evidence
from Wasson's physicians is not contradictory, and Wasson did not
continue to work after filing for disability in late August 2000.
Thus, even if Wasson had failed to submit any objective evidence -
which the Court has found is not the case - <u>Lown</u> would not control
as key facts present in <u>Lown</u> are not present in Wasson's case.

Media General's reliance on <u>Hensley</u> is also unavailing.   As an
initial matter, as an unpublished case, <u>Hensley</u> is merely an
informative analytical tool, not authoritative law.   In addition,
<u>Hensley</u> is internally inconsistent.   In <u>Hensley</u>, the Fourth Circuit

44

found that the record "was largely devoid of objective medical evidence of total disability, such as x-rays, test results or MRI reports." 123 Fed. Appx. at 538-39.  Yet, in a footnote directly after the sentence just quoted, the Fourth Circuit states that Hensley presented an MRI demonstrating that Hensley had degenerative disk disease, but did not have a herniated disc.  Id. at 539 n. 4.  Moreover, Hensley's evidence included the diagnosis letters of three of her treating physicians.  Id. at 538-39.  Thus, in Hensley, as here, there was objective evidence supporting Hensley's disability.

However, importantly, the record also showed that Hensley was exaggerating or feigning her pain.  Id.  Both of Hensley's physical therapist stated that Hensley exaggerated her pain and engaged in self-limiting behavior.  Indeed, following a second FCE ordered by Hensley's treating physician, one of the therapist wrote:

> The results of this FCE do not represent a
> valid measure of Brenda's maximum functional
> capacities as she significantly limited her
> performance due to pain and, at the same time,
> demonstrated maximum signs of magnified
> illness behavior . . ..  Her requests to
> terminate testing due to pain were made in
> conjunction with the lack of objective pain
> behavior and a pleasant, even jovial demeanor
> while rating her pain at a '9 out of 10.'

Id.  The therapist conducting the FCE concluded that Hensley could do sedentary work.  Id.  The Fourth Circuit held that "in the absence of objective evidence of Hensley's disability, it was reasonable for MetLife to conclude that the diagnoses of her

45

treating physicians rested primarily or exclusively upon Hensley's subjective pain complaints." Id. at 539.  The decision then noted that "the Fourth Circuit has held that denials of benefits are permissible where the claimant provides only subjective pain complaints and not objective evidence." 123 Fed. Appx. 534, 540-41 (4th Cir. 2004) (emphasis added).  The Court of Appeals explained that the "preference for objective verification is all the more reasonable in light of the evidence of symptom magnification present in this case." Id. at 540.

In contrast to Hensley, as the Court concluded in Wasson I, the "record [here] is replete with objective evidence." Wasson I, at 34.  The MRI and CT Scan showing the radial tear, the objective observations of Wasson's treating physicians, the objective assessment made in the FCE, and Broughton's Vocational Assessment and the physicians' decisions to prescribe significant quantities of pain medication and their views of the effects of that medication all constitute objective examinations and observations of Wasson conducted by trained, medical or rehabilitation professionals.

In addition, unlike in Hensley, Media General does not claim that Wasson is feigning or magnifying her symptoms.  Indeed, at oral argument, Media General stated that it takes Wasson at her word that she suffers from debilitating pain.  Unlike Hensley, Wasson has a radial tear in her lumbar spine.  More importantly,

46

unlike <u>Hensley</u>, none of the physicians or therapist that have treated Wasson have found that Wasson is magnifying her symptoms, or that her pain is anything less than genuinely debilitating. Indeed, the office notes and letters from Wasson's treating physicians show that Wasson remains in significant pain despite the high doses of prescription pain killers she takes.  Accordingly, the record in this case is factually distinguishable from the record in both <u>Lown</u> and <u>Hensley</u>.

Moreover, given the abuse of discretion standard at work in these types of cases, <u>Hensley</u>'s comment - that disability denials are permissible where claimants fail to submit objective evidence - is simply a truism that in no way changes pre-existing law or compels an outcome in Wasson's case.  A denial may be upheld where objective evidence is lacking; but it also may not be, depending on the facts of each case.  Because the Appeals Board's decision provides almost no substantive analysis and simply restates the opinions of its hired experts without discussing any additional evidence, and because Dr. Thomason's opinion is irrelevant and Dr. Kern's opinion is based on an incorrect assessment that Wasson did not submit objective evidence, the Court finds that the Appeals Board did not engage in a deliberate, principled reasoning process.

In addition, when this Court remanded Wasson's claim in <u>Wasson I</u>, it ordered Sedgwick to assess Wasson's claim <u>de novo</u> in a manner consistent with the law articulated in <u>Wasson I</u>.   Having found

47

troublesome "Sedgwick's [prior] decision . . . to have extended no credit to the many subjective indicia of disability that appears in the record," it is all the more troublesome that the Appeals Board's decision again fails to even mention the significant objective and subjective record evidence of disability.  In light of the explicit direction given to Sedgwick in <u>Wasson I</u>, Sedgwick's repeated failure to properly judge Wasson's claim based on the law of this case supports finding that the Appeals Board did not engage in a deliberate, principled reasoning process.

For all the foregoing reasons, this factor weighs against Media General.

**5.    Whether The Decision Is Consistent With The Plan And Prior Interpretations**

Wasson does not allege that her claim was treated any differently in terms of substance or procedure than any other participant under the Plan.  Accordingly, the fifth <u>Booth</u> factor weighs in favor of Media General.

**6.    Adherence To ERISA Procedural And Substantive Requirements**

Although Wasson filed her Complaint under 29 U.S.C. §§ 1132(a)(1)(B),(e), and (f), the provisions of ERISA creating a cause of action, establishing jurisdiction in federal district courts, and dispensing of an amount in controversy requirement, Wasson does not allege that Sedgwick or Media General failed to meet the requirements of ERISA.  The Court notes that in <u>Wasson I</u>,

48

the Court found that no ERISA procedural or substantive violations had occurred.  However, as discussed above, by failing to state valid specific reasons for denying Wasson's claim, the Appeals Board violated 29 U.S.C. § 1133(1) of ERISA.  Accordingly, the sixth Booth factor weighs in Wasson's favor.

**7.   External Standards**

As the parties agree that the Plan accords the administrator discretion, Wasson does not allege that any external standard applies in this case.  The sole exception, of course, is this Court's opinion and order in Wasson I, directing Sedgwick, on remand, to conduct a de novo review consistent with the Court's opinion - especially with respect to the issue of objective evidence - granting Wasson an opportunity to update the record, disclose fully all opinions issued by the Plan's medical advisors and all consideration given to those opinions, and specifically identify the definition used by the Plan to adjudicate Wasson's claim.  Sedgwick largely complied with the procedural component of the Court's orders.

However, as discussed above, the Court finds that Dr. Kern was in error in stating that Wasson presented no objective evidence to support her claim of disability.  Consequently, the Appeals Board's decision relied on a incorrect interpretation of the record evidence.  The Appeals Board's failure to heed the Court's articulation in Wasson I that objective evidence exists in this

49

case constitutes a failure to adhere to external standards. Accordingly, the seventh <u>Booth</u> factor weighs in Wasson's favor.

**8.    Conflict Of Interest**

In the Complaint, Wasson alleges that Media General was responsible for denying Wasson's claim after remand. Accordingly, Wasson argues that the Court should apply the so-called modified abuse of discretion standard that takes into account the conflict of interest that arises where the employer controls or is the same entity as the plan administrator. See <u>Wasson I</u>, at 19-21 (citing <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1988); <u>Ellis</u>, 126 F.3d at 233 (explaining the modified abuse of discretion standard)). However, the record makes clear that Sedgwick, and not Media General, controlled the administration of the Plan after January 1, 2001. Sedgwick is a corporate entity independent from Media General, but hired by contract to administer Media General's benefits plan.[8] Consequently, there is no conflict of interest in this case that would require application of the modified abuse of discretion standard, and that standard does not apply in this case.

---

[8] It has been held that such an interest, standing alone, presents a conflict of interest because the plan administrator has an interest in being retained as administrator. <u>Barnes v. Bell South Corp.</u>, 2003 U.S. Dist. LEXIS 18766 at *19 (W.D.N.C. 2003). That view, however, would mean that the modified abuse standard would apply in most cases because a business entity almost always is interested in keeping its clients. That goes beyond the teaching of <u>Ellis</u> respecting the modified abuse of discretion standard and hence is not applied here.

### 9.    Conclusion

The Court finds that the Appeals Board's decision was not the result of a deliberate, principled, reasoning process because it failed to comply with the Court's order and the law stated in Wasson I, failed to discuss the evidence on which it relied, merely regurgitated the irrelevant or incorrect statements of its hired physician experts, and ignored extensive evidence of Wasson's disability. Also the Court finds that the Appeals Board's decision was not based on substantial evidence. For the foregoing reasons, Media General's Motion for Summary Judgment will be denied.

Given the nature of the errors committed by the Appeals Board, the Court believes that remand is the most appropriate course of action to give Media General an opportunity to reassess Wasson's claim in perspective of this opinion and Wasson I. As the Court stated in Wasson I, "where a plan administrator has failed to comply with the ERISA guidelines in reviewing a claim, 'the proper course of action is to remand to the plan administrator for a full and fair review'" Wasson I, at 47 (quoting Weaver, 990 F.2d at 159). As in Wasson I, the Court has found here that Sedgwick "misapprehended the presence, as well as the significance, of relevant objective medical evidence," id. at 48, and based its decision on the incorrect or irrelevant conclusions of its physician advisors.

On remand, the Appeals Board shall consider as objective evidence of Wasson's disability all evidence described herein as objective evidence. And, the Appeals Board also shall consider all

51

subjective evidence of pain that is in the record because, although objective evidence provides a preferable base for decision, there is nothing in ERISA or the decisions of the Fourth Circuit that precludes consideration of subjective evidence of pain. Where, as here, the claimant is indisputedly not feigning pain and there is both subjective and objective evidence of disabling pain, a decision on the issue of disability must take account of both kinds of evidence.

How otherwise to proceed on remand is best left to the parties and the Appeals Board. However, the Appeals Board is informed that a reasoned, principled decision does not come about by the mere listing of documents and the regurgitation of a physician advisor's opinion. Nor is it permissible for a physician to disregard the findings made by the Court. Finally, it would be troublesome to see the Appeals Board try to consider the physician opinions that were rejected by the Review Board and not thereafter considered by the Appeals Board.

## IV. Wasson's Motion For Summary Judgment

Although each motion for summary judgment must be assessed independently, where a motion for summary judgment is denied, and that motion is diametrically opposed by a cross motion for summary judgment, normally no analysis need be done to determine that the opposing cross motion must per force be granted. However, Wasson's evidence of disability does not compel a finding in her favor, notwithstanding that the evidence of disability is both persuasive and substantial. It is possible, albeit unlikely, that, the

Appeals Board could have denied Wasson's claim even if the Appeals Board had complied with Wasson I, had considered as objective evidence all that this opinion and Wasson I describe as objective evidence, and had considered the subjective evidence of disability. Therefore, it is preferable that the Appeals Board be required to do its job correctly, to act in accord with this opinion and Wasson I and then reasonably explain its reasons so that meaningful judicial review of the substantive decision can be had.  The remand will permit that to occur.[9]

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, the defendant's Motion for Summary Judgment (Docket No. 10) will be denied, and the plaintiff's Motion for Summary Judgment (Docket No. 12) will be denied.  The matter will be remanded for further proceedings not inconsistent with this opinion.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so Ordered.

                                        /s/
                              Robert E. Payne
                              United States District Judge

Richmond, Virginia
Date: August 25, 2006

---

[9] Nothing in this opinion precludes Wasson from offering current MRIs or X-rays to help the Appeals Board in its task. Indeed, it is surprising that Wasson did not do that following the decision in Wasson I.